UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL  ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:11-cv-00762-SEB-DKL |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is now before the Court on Defendant's Motion for Summary Judgment
[Docket No. 69], filed on August 27, 2014, pursuant to Federal Rule of Civil Procedure
56.  Plaintiff Michael Alexander filed this lawsuit against Defendant, the United States of
America, alleging several claims under the Federal Tort Claims Act.  Following a motion
to dismiss and a subsequent appeal, the only claims remaining before us are Mr.
Alexander's claims for malicious prosecution and intentional infliction of emotional
distress ("IIED").  For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion
for Summary Judgment.

**<u>Factual Background</u>**[1]

Plaintiff Michael Alexander is a licensed attorney in the State of Indiana with a
large part of his legal practice devoted to criminal defense work.  On February 26, 2008,

---

[1] Certain facts contained in Plaintiff's response in opposition to the motion for summary
judgment are either pure argument or not supported by correct citations in the record and have
thus been disregarded.  *See* S.D. Ind. L.R. 56-1(e) and (h).

Alexander was arrested by Neal Freeman, an agent of the Indianapolis Division of the Federal Bureau of Investigation ("FBI"), and charged with conspiracy to commit bribery, a Class C Felony, in Delaware Circuit Court No. 3. Pl.'s Exh. A (Probable Cause Aff.). On March 13, 2009, following a jury trial in the Delaware Circuit Court, Cause Number 18C03-0802-FC-03, Alexander was acquitted on this charge.

**Alleged Bribery in Randolph County Involving Rodney Dobbs Case**

The chain of events that eventually resulted in Alexander's arrest began in March 2006, when the Indianapolis Division of the FBI opened an investigation into allegations of corruption and bribery in Randolph County, Indiana. At that time, information available to the FBI indicated that Jeffrey Dobbs, an individual arrested on child molestation charges in Randolph County, paid $24,000 to a private investigator named Jeffrey Hinds based on Hinds's promise that he had friends in the Randolph County Prosecutor's Office who could make Dobb's case "go away" or send it to the "lost file." Freeman Decl. ¶ 4. Hinds was then a private investigator who worked for Alexander and other attorneys in Randolph County and Delaware County, among others. Hinds kept an office in the same suite as the Michael Alexander law firm, although Dobbs was being represented on the child molestation charges by another attorney.

In February 2006, Dobbs contacted the FBI regarding the alleged bribery. *Id.* Special Agent ("SA") Freeman was assigned to the case and led the investigation. SA James Howell assisted in certain aspects of the investigation until he retired from the FBI in September 2007. SA Howell was present for a number of witness interviews and undercover operations and acted as a witness to the interviews and consensual monitoring

2

sessions conducted as part of the bribery investigation.  In March 2006, for example, after receiving appropriate authorization from the FBI, SA Freeman monitored several phone calls between Rodney Dobbs, Jeffrey Hinds, and Dobbs's attorney at the time.

**Alleged Bribery in Delaware County Involving Christopher Bryant Case**

A few months passed without further pertinent developments in the investigation until SA Freeman was contacted in June 2006 by Joseph Orick, a Deputy Prosecutor in the Delaware County Prosecutor's Office.  Orick provided a written statement and was also interviewed by SA Freeman.  Orick told SA Freeman that he was contacted by a man named Stanley Chrisp who said that Hinds had offered to pay him and his son $20,000 and other benefits to change their testimony in a criminal case involving an individual named Christopher Bryant, who was represented by Alexander.  Bryant was charged with intimidation based on the allegations of Chrisp and his two sons, Stanley Wills and Adrian Kirtz, that Bryant had pointed a loaded gun at Wills and threatened to kill him in front of Chrisp and Kirtz.

According to Orick's statement to SA Freeman, Chrisp told him that Hinds had contacted him (Chrisp) and offered to pay him and his two sons to change their testimony in Bryant's criminal case.  Chrisp stated that he and Kirtz had met with Hinds at the Michael Alexander law office and were told by Hinds that Alexander had received $20,000 from Bryant and said that they could "all make money off of this case." Freeman Decl. ¶ 6.  Chrisp further alleged that he saw Hinds give Kirtz $2,500 after Kirtz provided a statement.  Exh. 2 to Freeman Decl. (June 7, 2006 Orick Statement).

Bryant's arresting officer, Muncie Police Department Detective Nathan Sloan, sent SA Freeman a written statement dated June 15, 2006. In his statement, Detective Sloan represented that he had been contacted by Chrisp who had told him that someone from Alexander's law firm told him that Bryant's case would never see the inside of a courtroom since Chrisp was only 80% of his identification of Bryant. Chrisp told Detective Sloane that he and Wills had been contacted by Hinds and that Hinds wanted to arrange for Chrisp and Wills each to receive $5000 from Bryant in exchange for retracting their statements. Def.'s Exh. 2 (June 15, 2006 Sloan Statement).

After receiving these statements, SA Freeman conducted a monitored phone call between Orick and Chrisp during which Chrisp confirmed the story he had previously told Orick and Detective Sloan regarding the bribery allegations. Chrisp also stated that Alexander was present in his law office during certain of the conversations with Hinds when those matters were discussed.

On June 23, 2006, Detective Sloan interviewed Kirtz who provided a written statement in addition to a recorded interview. SA Freeman was provided with copies of both the written and taped statement and reviewed them during the investigation. During the interview, Kirtz described the incident with Bryant and confirmed that it was Bryant who had threatened Kirtz and his family and pointed a gun at them. Kirtz also stated that not long after the incident occurred, Bryant offered Wills $5,000 to change his statement.

According to Kirtz, Bryant told Wills, "all you have to do is go down there and talk to my attorney."[2]  Def.'s Exhs. 1 and 4 to Freeman Decl.

Kirtz further stated that several weeks after the incident occurred, he went to Hinds's office and Hinds asked him to give a statement regarding the Bryant incident in which Kirtz would represent that he was unsure whether it was Bryant who threatened his family.  According to Kirtz's statement, Hinds then told him that "you can make money too" and offered him $20,000 to give the statement.  *Id.*  Hinds also offered to obtain a reduced sentence for Kirtz or to have Kirtz taken off probation in another criminal case and to assist him with medical bills.  Kirtz told Detective Sloan that he knew that Hinds was Alexander's private investigator and stated that Hinds kept calling Kirtz and Chrisp and telling them that if the criminal case went to trial, "Mick" [Alexander] would tell the jury about Kirtz's prior criminal record and reminding them that "Mick" is a "hell of a cross examiner."  *Id.*  Kirtz stated that Hinds promised him $5,000 up front to come in and give a statement.  Kirtz, Wills, and Chrisp eventually went to Hinds's office to make statements.  According to Kirtz, he rehearsed his statement with Hinds who told him what to say and assured him that, "you're not really lying, you're just saying you aren't sure." *Id.*  Kirtz said Hinds gave him only $2,500 on that date, but later gave him additional money, totaling $6,000.

---

[2] We note that Bryant was originally represented by Ronald K. Smith, who entered his appearance in Bryant's case on October 3, 2005.  Alexander did not enter his appearance until November 8, 2005.  It is not clear from the record the exact date on which the statement referencing Bryant's attorney was made, and thus, it is not clear whether it was Smith or Alexander (or both) who was then representing Bryant.

During the interview, Detective Sloan asked Kirtz directly about Alexander's involvement in the scheme. Kirtz stated that Hinds was Alexander's investigator, that it was only the two of them (Hinds and Alexander) in the office, and that "nothing goes in the office without Mick knowing. Mick knows everything." Exh. 1 to Freeman Decl. Kirtz further stated that Hinds would tell him things that Alexander had conveyed to Hinds and that when he (Kirtz) went to review the statement he had given Hinds, it had highlighting and notes in the margin. According to Kirtz, Hinds told him, "Mick already went through this." Exhs. 1 and 4 to Freeman Decl.

After reviewing the above information, SA Freeman recommended that the FBI open an investigation as to Hinds and Alexander for potential charges under 18 U.S.C. § 666 for "[t]heft or bribery concerning programs receiving Federal funds." Freeman Decl. ¶ 12. SA Freeman's decision to initiate an investigation was approved by the FBI Special Agent in Charge and the Assistant Special Agent in Charge of the Indianapolis Division of the FBI. *Id.*

**The FBI's Bribery Investigation of Hinds and Alexander**

     **A.     July 2006 – December 2006**

In July 2006, SA Freeman interviewed Chrisp, who conveyed the same information that he had shared with Orick. To wit, that he, Wills, and Kirtz agreed to change their statements or give false statements to Hinds about the Bryant incident in exchange for Hinds's offer of money and other benefits, including promises to contribute to Kirtz's medical bills and to help Kirtz get off probation in another criminal matter. According to Chrisp, Hinds assured him that there would be no consequence other than

that Alexander would get the charges dropped against Bryant. Chrisp told SA Freeman that he and his sons provided revised statements to Hinds that were then given to the Delaware County Prosecutor's Office, which resulted in reduced charges against Bryant. Chrisp said that Hinds gave $2,500 to Kirtz and later gave another $2,500 to Wills. Chrisp also received $1,000 from Hinds, for a total amount paid by Hinds of $6,000 to the three men. They were not paid the remaining $14,000 Hinds had promised, however, which was the reason Chrisp decide to report the incident to the Delaware County Prosecutor's Office, who in turn, reported it to the FBI. *Id.* ¶ 13.

Also in July 2006, SA Freeman interviewed Wills and Kirtz. Both men stated that Hinds had arranged for them to come to Alexander's law office to provide recorded statements, the substance of which, they said, was coached by Hinds. Wills and Kirtz confirmed that they had agreed to change their statements in exchange for $20,000 and that Kirtz received $2,500 from Hinds as an initial payment. *Id.* ¶ 14.

Around this same time, SA Freeman began conducting consensually-monitored telephone calls and meetings among Chrisp and Kirtz and Hinds and/or Alexander. Before using body recording devises on witnesses, SA Freeman received authority from FBI supervisors, including the Assistant Special Agent in Charge and the Chief, Division Counsel of the Indianapolis Division of the FBI.

The first date on which SA Freeman sought to record a conversation with Alexander was July 12, 2006. There is some dispute between the parties regarding whether any conversation actually took place on that date. According to Alexander, he had a conversation with Chrisp and Kirtz on July 12th during which they told him for the

first time about the bribery scheme.  In response, Alexander said he told them he did not know what they were talking about and that he would "check with Hinds."  Although it is not clear from Kirtz's and Chrisp's  trial testimony what date this conversation occurred, both men did testify at trial that they had a conversation with Alexander at some point in the summer of 2006 during which they discussed the bribery scheme of which Alexander denied any knowledge.  Pl.'s Exh. G at 51-52, 54-56; Pl.'s Exh. H at 66-67.  Chrisp and Kirtz further testified that they next informed SA Freeman of their conversation with Alexander.  Pl.'s Exh. G at 56; Pl.'s Exh. H at 67.  SA Freeman testified by deposition that while Chrisp and Kirtz were hooked up with electronic monitoring equipment on July 12, 2006 in an attempt to meet with Alexander, he did not recall whether they were actually able to meet with him on that date.  Pl.'s Exh. E at 48-49; Pl.'s Exh. F at 3-6.  SA Freeman did not included in his written report regarding the events of July 12, 2006 that Kirtz and Chrisp were unable to meet with Alexander that day.[3]  Nor did SA Freeman record what Kirtz and Chrisp had told him during the debriefing he held with them following the surveillance attempt.

SA Freeman further testified that while the surveillance log for July 12, 2006 shows that both Kirtz and Chrisp were hooked up to electronic monitoring equipment between 2:47 p.m. and 4:18 p.m. (approximately an hour and a half), Chrisp's recording

---

[3] The consensual monitoring form completed by SA Freeman for July 12, 2006 listed three participants – Kirtz, Chrisp, and Alexander, despite Freeman's assertion that no meeting with Alexander occurred that day.  SA Freeman testified by deposition that the reason Alexander was included on the form was because Freeman had completed those forms before the surveillance occurred, based on his anticipation of who would be present.  Pl.'s Exh. F at 17; Pl.'s Exh. I at 76.

device failed altogether and Kirtz's device stopped recording after 49 minutes, at which point Chrisp and Kirtz were still waiting at the Alexander law firm to try to speak with Alexander. Pl.'s Exh. F at 6-7. Thus, there is no recorded evidence of any conversation that may have occurred between the informants and Alexander on July 12, 2006. It is not clear what caused the recording devices to fail on July 12, 2006. SA Freeman testified that he believes the battery died in the device attached to Kirtz and that a malfunction in Chrisp's device caused it to fail altogether. Pl.'s Exh. F at 7-8. Beyond SA Freeman's speculations, there is no documentation or other evidence to establish with certainty the cause of these failures.

The next occasion conversation to be recorded occurred on July 31, 2006, when Kirtz called the Alexander law office and spoke to Hinds about the Bryant statements. Hinds told Kirtz that Bryant was not returning his phone messages, but that he intended to keep trying. Hinds said that Orick had "continued" a plea hearing, adding, "I don't know why. But I'll find out." Exh. 1 to Freeman Decl. Kirtz called Hinds again on August 14, 2006, when Hinds told him, "I cannot get that young man [Bryant] to call me back," promising to keep Kirtz informed. *Id.*

On September 11, 2006, Kirtz and Chrisp met with Bryant's family. During that meeting, Kirtz complained to Bryant's father that he had not received all of the money he had been promised and that he had been trying to call "Mick" to find out what was happening. Bryant's father replied that he had received a letter from Alexander "the other day." Freeman Decl. ¶ 25. Bryant's father also told Kirtz, "give me a couple of days and I'll find out." Exh. 1 to Freeman Decl. Chrisp and Kirtz again met with

Bryant's father on September 27, 2006 to inquire about the money they were owed, and Bryant's father assured them again that he would look into it. *Id.*

On October 16, 2006, Kirtz again called Hinds at the Alexander law office. Kirtz spoke with Hinds about not being fully paid for the Bryant witness statements and asked whether Bryant had delivered $1,000 to Hinds. Hinds replied that Bryant had not yet done so, adding that Bryant "is a piece of shit." Def.'s Exh. 7 (Trans. Of Oct. 16, 2006 Call). Kirtz replied, "I've done helped you out too, buddy …. And you made us do this for you." *Id.* Later that day, Hinds called Kirtz to tell him to come in the next day for his money because Bryant "says he is going to have fifteen hundred dollars to me." *Id.*

On October 18, 2006, Kirtz and Chrisp visited the Alexander law office wearing body recording devices supplied by the FBI. Hinds agreed to meet with Kirtz, but not Chrisp. During the meeting with Kirtz, Hinds delivered to Kirtz $1,000 in cash, which he stated he had received from Bryant. Def.'s Exh. 9 at 13 (Trans. of Oct. 18, 2006 Meeting). Kirtz also asked Hinds about whether Hinds had been able to arrange for him to get on probation for his criminal case. Hinds responded, "we tried," but that "somethin' happened there …." *Id.* at 15. Hinds then said, "Why don't you call me tomorrow, and I'll tell you if, and I'll get Mick to file your papers with [the Probation Department]." *Id.* at 16.

From October through December 2006, Kirtz continued to call Hinds to inquire regarding his probation status and to determine whether Hinds had received additional money from Bryant. On October 25, 2006, Hinds told Kirtz, "I promise I will help you get on probation." Def.'s Exh. 10 (Trans. of Oct. 25, 2006 Call). Hinds further assured

Kirtz that as soon as they got off the telephone, he would "immediately, if not today …

go in there and say something to Mick, um, that it's a personal thing to me that you get

off probation and he will help us do it." *Id.*

On November 7, 2006, Kirtz again called Hinds to ask if Hinds had an update on

his probation. Hinds responded, "no," but indicated that he had spoken with "Mick" and

another criminal defense attorney about it and the other criminal defense attorney told

Hinds he would help with the paperwork and "have Mick sign off on it." Def.'s Exh. 12

(Trans. of Nov. 7, 2006 Call). On November 20, 2006, Kirtz placed another call to Hinds

about his probation, and Hinds told him that a petition to be removed from probation

would be filed and that something would be done "behind the scenes" to set it for a

hearing. Def.'s Exh. 13 (Trans. of Nov. 20, 2006 Call). On November 29, 2006, Hinds

informed Kirtz that "everything is a go" with respect to getting Kirtz off probation by

Christmas.

### B.     January 2007 – March 2007

In January 2007, Chrisp called Hinds to inquire about representation for Kirtz on

newly-filed drug charges. Chrisp asked Hinds whether Hinds could get Bryant to give

Chrisp "a little more change" to contribute to Kirtz's bond. Hinds responded that

Alexander would charge $50,000 to handle the drug charges against Kirtz. Kirtz then

phoned the Alexander law firm to set up a meeting with Alexander.

On February 1, 2007, Kirtz and his grandfather went to the Alexander law office

to meet with Alexander. Kirtz was apparently equipped with two body recording

devices. However, both of the recording devices malfunctioned and did not record. The

tape recording from that meeting reveals nothing beyond SA Freeman saying, "test, test, test," followed by dead air. SA Freeman testified that he remembered that day to have been a bright, snowy day and that, given the brightness, he was unable to fully observe the indicator lights on the devices. He further testified that he likely mistakenly believed the devices were off when they were actually on, and thus, when he thought he was turning them on, he was actually turning them off. Pl.'s Exh. E at 76, 84. For whatever reason, no recording exists for the February 1, 2007 meeting, nor is there a surveillance log entry for that date.

After Kirtz departed the February 1, 2007 meeting, SA Freeman interviewed him and learned that he had met alone with Hinds and Alexander to discuss Alexander's representation of him on the drug charges. Def.'s Exh. 14 (Feb. 1, 2007 Interview). Kirtz further informed SA Freeman that they had all discussed the Bryant issue and that Alexander agreed to take $5,000 off of the price of representing Kirtz, reducing his fee to $45,000, because Kirtz had not been paid fully for providing a false statement in Bryant's case. *Id.* Alexander provided Kirtz with a signed, written statement, acknowledging that he reduced his attorney fees from $50,000 to $45,000. Def.'s Exh. 15. SA Freeman did not conduct an interview of Kirtz's grandfather to confirm the events recounted by Kirtz relating to the meeting.

According to Alexander, while acknowledging that he did cut his fee by $5,000 for representing Kirtz on February 1st, there was no discussion about the alleged bribery scheme nor was there any discussion suggesting that the reason for his decision to reduce

his fee was to reflect money that Bryant owed Kirtz in payment for changing his sworn statement.

On February 15, 2007, Chrisp and Kirtz again met with Alexander and Hinds at the Alexander law office. SA Freeman had previously supplied Chrisp with $5,000 in cash to pay to Alexander as payment for his legal representation.[4] At the meeting, the parties discussed Kirtz's drug case and the seizure of some of his assets. At some point, Chrisp raised the issue of the Bryant case, regarding which the following exchange took place:

| | |
|---|---|
| Chrisp: | Well what about you and [Kirtz], about the money, you know, that Chris Bryant owes us, about given' him so much out of it, you know, for the case, like takin' five thousand, I mean, was it five thousand? … Was you gonna like take five thousand dollars off of it for the money you already owe us? |
| Alexander: | Yeah. |
| Chrisp: | Okay. |
| Alexander: | Then I told him I'll do that. |
| Hinds: | Absolutely. |
| Alexander: | I don't think I should have to, but I told him I'd do it anyway. |

_____

[4] SA Freeman had received the $5,000 he gave to Chrisp from Jess Neal, a member of the local Drug Task Force. According to Alexander, there was a connection between Neal and Mark McKinney, who was the Delaware County Prosecutor at the time. Alexander and McKinney had a soured working relationship stemming from Alexander having publicly discussed what he believed to be the illegality of the forfeiture procedures used by McKinney in his roles as first deputy and prosecuting attorney. Alexander publicly stated his belief that McKinney was allowing individuals to enter into confidential agreements in cooperation with the drug task force to forfeit money and goods in exchange for leniency and special treatment on cases. Pl.'s Exh. L at 18-22. SA Freeman met with Kirtz in jail not long after his arrest on the drug charges. During that meeting, Kirtz told SA Freeman that he had had a conversation with McKinney and on that basis, Kirtz believed that McKinney "wanted a case" against Alexander and wanted to work with Kirtz against Alexander. Pl.'s Exh. I at 89-92.

…

Chrisp:      But that's why I came to you about [Bryant], because the fact
             is, you know, he got all this money, and we'd like, you know,
             just pay us on all, we done this thing for you as far as change
             our statement for him.  Why'd he think we just dropped it like
             this, and we try to help everything out for the case and be
             done with it.

Alexander:   I understand.  I'm just tellin' you what he told me.

Def.'s Exh. 16 at 25, 28-29.

Around March 7, 2007, SA Freeman interviewed Bryant.  Bryant stated that after
he retained Alexander to serve as his criminal defense attorney, he was approached by
Hinds to work out a deal to have the charges dropped.  Bryant further stated that he had
agreed with Hinds that Hinds would pay Kirtz, Chrisp, and Wills to change their
statements regarding whether Bryant had threatened Wills or pointed a gun at him.
Bryant also told SA Freeman that he gave Hinds $2,000 in cash in September 2005 and
$3,000 in cash in November 2005 to pay these witnesses.  Bryant also confirmed that he
was subsequently contacted by Hinds requesting more money.  Exh. 17 to Freeman Decl.
During that interview by SA Freeman, Bryant stated that he personally did not know
whether Alexander knew about the bribery scheme because all of the discussions he had
had with regard to the matter were with Hinds and that Alexander was not present on any
of the dates that Hinds turned over the money for Kirtz, Wills, and Chrisp.[5]  Exh. I at
104.

---

[5] The probable cause affidavit did not include this information.

From March 2007 through October 2007, Kirtz continued to call the Alexander

law office requesting each time to speak to Alexander or his assistant about his (Kirtz's)

inability to pay Alexander's entire retainer.  Kirtz's March 21, 2007 visit to the

Alexander law firm included his telling Alexander and Hinds about obtaining money

from his grandfather to apply toward his legal fees.  After the meeting, Hinds spoke to

Kirtz alone, mentioning that he (Hinds) had recently run into Bryant.  Kirtz later told SA

Freeman that when he brought up the money that Bryant still owed him for changing his

statement, Hinds told him to "be patient."  Def.'s Exh. 1, file no. 1D50.

On July 30, 2007, Kirtz again phoned the Alexander law firm, this time speaking

directly to Alexander about getting back some of his money so that he could find a

different attorney.  Kirtz told Alexander that he appreciated him "knocking the money off

and all that."  Def.'s Exh. 1, file no. 1D52.  Alexander asked Kirtz about the status of his

case, and Kirtz responded that he had succeeded in pushing back the date of his initial

hearing.  *Id.*  Alexander told Kirtz that he would "talk it over with Jeff [Hinds]" and see

what he could do.  This is the final recorded conversation involving Alexander

personally.

**Bribery Charges Are Filed and Alexander Is Acquitted**

In December 2007, Hinds was tried and convicted of bribery in a Delaware

County court and sentenced to five years.

On February 26, 2008, SA Freeman executed an Affidavit for Probable Cause,

Conspiracy to Commit Bribery, a Class A felony, targeting Alexander.  A Special

Prosecuting Attorney, James D. Luttrell, Jr., was assigned to the case.  Judge Robert L.

Barnet, Delaware Circuit Court No. 3, examined the Information and Probable Cause

Affidavit and, on February 27, 2008, determined probable cause to exist on which to base

the arrest of Alexander for the crime of conspiracy to commit bribery.

Alexander was tried before a jury and acquitted on March 13, 2009.

**Alexander's Prior Relationships with SA Freeman and SA Howell**

The record before us makes clear that SA Howell played no role in instituting

criminal charges against Alexander including preparation of the Probable Cause Affidavit

submitted to the Delaware County Prosecutor's Office. In fact, SA Howell had retired

from the FBI by the time the affidavit was prepared and submitted, and was not present

even for the trial. SA Howell and Alexander had no personal connection or relationship

and never met or interacted in the course of this investigation. Furthermore, was SA

Howell never acted as an FBI special agent on any of Alexander's prior criminal cases.

Prior to SA Freeman's investigation of Alexander, Freeman had known that

Alexander was a criminal defense attorney practicing in Delaware County, but they had

no personal or official relationship or interactions prior to Alexander's arrest. Alexander

testified that he had never had any problems with SA Freeman in the past nor did he

recall SA Freeman serving as the FBI special agent on any of Alexander's prior cases.

**The Instant Litigation**

Alexander filed his complaint in this action against the United States on June 7,

2011, alleging various claims under the FTCA, including defamation, *Brady* violations,

malicious prosecution, and IIED. The United States moved to dismiss all these claims,

which motion was granted on April 20, 2012. Alexander appealed that decision to the

Seventh Circuit who reversed and remanded only the malicious prosecution and IIED claims for further proceedings.  *Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013).  The government's motion for summary judgment on the remanded claims is now fully briefed and ready for ruling.

## Legal Analysis

### I.    Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence

to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th

Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the

non-movant, if genuine doubts remain and a reasonable fact-finder could find for the

party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc.*

*v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*,

870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to

satisfy the legal requirements necessary to establish her case, summary judgment is not

only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*,

324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element

"necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## II.     Discussion

### A.     Malicious Prosecution

The elements of a malicious prosecution action under Indiana law are: "(1) the

defendant instituted or caused to be instituted an action against the plaintiff; (2) the

defendant acted maliciously in so doing; (3) the defendant had no probable cause to

institute the action; and (4) the original action was terminated in the plaintiff's favor."

*Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. Ct. App. 2005). For purposes of its motion for summary judgment, the United States does not dispute that the first and fourth elements have been met here. Thus, the only issues before us are whether the United States acted maliciously in instituting the bribery charge against Alexander and whether there was probable cause to institute that charge. Because the probable cause determination affects the inquiry regarding whether the government acted with malice, we turn first to address whether probable cause existed. *See Brown v. Indianapolis Housing Agency*, 971 N.E.2d 181, 186 (Ind. Ct. App. 2012) ("Malice may be inferred from a total lack of probable cause ….").

In the context of a malicious prosecution claim, "probable cause to commence criminal proceedings" exists "when a reasonable inquiry would induce a reasonably intelligent and prudent person to believe that the accused committed the crime charged." *Glass v. Trump Ind., Inc.*, 802 N.E.2d 461, 466-67 (Ind. Ct. App. 2004) (citing *Conwell v. Beatty*, 667 N.E.2d 768, 778-79 (Ind. Ct. App. 1996)). Under Indiana law, "a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution." *Id.* at 467 (citing 667 N.E.2d at 768). Here, it is undisputed that a judicial determination of probable cause was made in the criminal case against Alexander. Thus, in order to survive summary judgment on his malicious prosecution claim, Alexander must present evidence to rebut the prima facie case, to wit, evidence establishing that the finding of probable cause "was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing." *Id.*

After a thorough and careful review of the record, we are convinced that the evidence Alexander has adduced in an effort to rebut the prima facie case of probable cause falls clearly short of the required mark. Alexander argues that SA Freeman destroyed the recordings from the July 12, 2006 and February 1, 2007 meetings, falsified "exit interviews" with his informants following those meetings, and withheld exculpatory information divulged during those meetings from his probable cause affidavit. Alexander further maintains that SA Freeman conspired with former prosecutor McKinney to "manufacture evidence" to charge Alexander with bribery. A review of the evidence adduced by Alexander does not support these descriptions or arguments nor does it vitiate the finding of probable cause.

First, there simply is no evidence to support the conclusion that SA Freeman destroyed or tampered with either the July 12, 2006 or the February 1, 2007 tape recordings generated by undercover investigative efforts. It is true that the recordings attempted to be created on those days either cannot be heard or did not capture any conversations or sounds. But that fact, without more, is insufficient to establish that SA Freeman was somehow responsible for destroying or tampering with the evidence. In fact, the record establishes otherwise. Evidence technician Carol Hefner stated in a declaration that she received each of the recording devices in question from SA Freeman within one to two days of the uses of the devices and that, they were intact and did not appear to be damaged. Def.'s Exh. D ¶¶ 7-8. Hefner further testified that these devices are specifically designed such that agents are not able to listen to the recordings or erase recordings until they have been downloaded by her. *Id.* ¶ 5. Because the recordings are

digitally stored on the device and it is she, not the case agent, who downloads the recordings, the case agent is unable to erase or alter the information stored on the devices. *Id.* Accordingly, Alexander's contention that SA Freeman intentionally tampered with or destroyed the recordings lacks any evidentiary support.

If we were to accept as true Alexander's accounts of the July 12, 2006 and February 1, 2007 conversations, summary judgment would still be warranted with respect to his malicious prosecution claim because these conversations would not defeat or overcome probable cause. It is true that "police may not ignore 'conclusively established' evidence that defeats probable cause," *Nelson v. Village of Lisle, Ill.*, 437 F. App'x 490, 494 (7th Cir. 2011) (quoting *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)), or "clearly exculpatory facts." *Stokes v. Bd. of Educ. of City of Chicago*, 599 F.3d 617, 624 (7th Cir. 2010). However, as the United States contends, even if Alexander flatly denied any involvement in the bribery scheme during both conversations and SA Freeman omitted that information from his probable cause affidavit, Alexander's own protestations of innocence alone would be insufficient to negate probable cause. *See Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999) ("Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established."); *Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.").

Here, it is undisputed that Hinds, who worked for Alexander as a private investigator, paid witnesses to change their testimony in a prosecution brought against a

defendant, Bryant, who was represented by Alexander. Taped conversations show Hinds referencing Alexander on multiple occasions, in some cases indicating that Alexander had some involvement in the bribery scheme. For example, Hinds promised Kirtz that Alexander would file legal paperwork to have Kirtz removed from probation (which was one of the benefits offered in exchange for Kirtz's changed statement) and represented to Kirtz that Alexander was involved in editing the changed statements in the Bryant case. *E.g.*, Def.'s Exh. 9 (Hinds informs Kirtz that he would "get Mick to file your papers with Buddy"); Def.'s Exhs. 1 and 4 to Freeman Decl. (after Kirtz noticed his statement had highlighting and notes in the margin, Hinds stated, "Mick already went through this").

Alexander's own statements regarding his decision to take $5,000 off of his $50,000 fee for Kirtz provide further evidence supporting probable cause. On February 1, 2007, Alexander provided Kirtz with a signed, written statement acknowledging that he had reduced his attorney fees from $50,000 to $45,000. Two weeks later, in a recorded conversation on February 15, 2007, Chrisp complained to Alexander that he still had not been paid by Bryant, which fact Alexander acknowledged. In response to Chrisp's question regarding whether Alexander was going to discount the $5,000 "for the money you already owe us," Alexander answered, "yeah." Def.'s Exh. 16 at 25. Chrisp then referenced the Bryant bribery scheme, stating, "We done this thing for you as far as change our statement for him," to which Alexander responded, "I understand." *Id.* at 28-29.

Although Alexander contends that there is an innocent explanation for his statements as well as his decision to reduce his fee, that would not be enough even if true

to negate probable cause given the other undisputed information included in the probable cause affidavit. Probable cause exists "when a reasonably intelligent and prudent person would be induced to act as did the person who is charged with the burden of having probable cause." *City of New Haven v. Reichhart*, 748 N.E.2d 374, 379 (Ind. 2001) (citation and quotation marks omitted). Given the close connection between Hinds and Alexander, Hinds's clear involvement in and culpability for eliciting bribes in a case where Alexander was counsel, Alexander's decision to reduce his attorney fee, and statements personally made by Alexander during the February 15, 2007 conversation, "a reasonably intelligent and prudent person" could easily and logically have deduced that Alexander was not just aware of the bribery scheme, but was in fact participating in it. For these reasons, a reasonable jury would have no basis on which to conclude that the judicial finding of probable cause was the result of SA Freeman's fabrication, withholding, or destruction of evidence. Accordingly, Alexander's attempt to rebut the prima facie evidence of probable cause is unavailing.

Nor has Alexander presented evidence establishing that either SA Howell or SA Freeman acted out of malice or animosity toward him, which is required to recover on a malicious prosecution claim. Alexander claims that SA Freeman exhibited such malice by conspiring with McKinney to manufacture evidence against him, but there is a complete dearth of evidence to support such a contention. The only evidence designated by Alexander in this regard is a statement by Kirtz to SA Freeman made in early 2007 that, based on a conversation Kirtz had had with McKinney, Kirtz "believed" McKinney "wanted a case" against Alexander. Even if Kirtz's speculation about McKinney's

intentions were admissible, the fact that McKinney may have "wanted a case" against Alexander no way proves that SA Freeman conspired with McKinney to falsely accuse Alexander of bribery. In fact, by mid-2006 the FBI had already opened the bribery investigation, long before Kirtz's alleged conversation with McKinney. There is simply no evidence that McKinney played a role in the FBI's decision to investigate Alexander or that McKinney was somehow improperly involved in the investigation of Alexander.[6]

For these reasons, Alexander's claim that SA Howell or SA McKinney harbored any malice against him is a nonstarter. Further, he has entirely failed to establish that there was an absence of probable cause for the conspiracy charge brought against him in connection with the bribery scheme. Accordingly, his claim for malicious prosecution must yield to summary judgment in favor of Defendant.

### B.    Intentional Infliction of Emotional Distress

A defendant is liable for intentional infliction of emotional distress (IIED) under Indiana law if he or she "(1) engages in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Brown*, 971 N.E.2d at 188. In order to satisfy the first element of an IIED claim, a defendant's

---

[6] Alexander seems to suggest in his response in opposition to the instant motion that SA Freeman should have interviewed Kirtz's grandfather following the February 1, 2007 meeting at which Kirtz, his grandfather, and Alexander were present. However, Alexander fails to meaningfully develop his argument in this respect that the FBI conducted a faulty investigation. Moreover, as explained by SA Freeman, Freeman reasonably believed that there was no need to interview Kirtz's grandfather because it is undisputed that he was not in the room when Alexander and Kirtz allegedly were discussing reducing Alexander's fee to represent Kirtz. Thus, SA Freeman's failure to interview Kirtz's grandfather does not raise an inference of malice or establish a lack of probable cause. *See Wong v. Tabor*, 422 N.E.2d 1279, 1289 (Ind. Ct. App. 1981) ("[W]here there is some factual basis for bringing a claim, lack of probable cause cannot be based upon a negligent failure to investigate fully.") (citations omitted).

conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) (citation and quotation marks omitted). Here, Alexander's IIED claim is premised on the same facts underlying his malicious prosecution claim, to wit, that probable cause for his arrest did not exist and that SA Freeman acted with malice in causing an action to be brought against him. Because, as we have explained in Part II.A *infra*, Alexander has failed to establish either of those propositions, his IIED claim based on those facts also fails.

## III.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. Final judgment shall enter accordingly.

IT IS SO ORDERED.


Date:    2/5/2015                                       _Sarah Evans Barker_____
                                                                    SARAH EVANS BARKER, JUDGE
                                                                    United States District Court
                                                                    Southern District of Indiana

Distribution:

Donald K. McClellan
MCCLELLAN & MCCLELLAN
gah241966@yahoo.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov